UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| MANUEL VERA BETANCOURT, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | C.A. No. 04-11876-RCL |
| ) | |
| JOHN ASHCROFT, Attorney General for ) | |
| the Unites States, et al. ) | |
| ) | |
| Respondents. ) | |
| _____ ) | |

**RESPONDENTS' RETURN AND MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

Respondents, John Ashcroft, the Attorney General for the United States, Steve

Farquharson, the District Director of the Immigration and Naturalization Service ("INS"), and

the INS, move the Court to dismiss Manual Vera Betancourt's ("Petitioner" or "Bentancourt")

petition for a writ of habeas corpus.  The Petitioner is a Mariel Cuban who was apprehended at

the border of the United States, was denied admission, and was subsequently ordered removed

from the United States based on his criminal activities.  INS currently is detaining Petitioner

awaiting his removal.  In his Petition, he contends that Zadvydas v. Davis, 533 U.S. 679 (2001),

compels his release from INS custody because (i) his continued detention pending his removal

has exceeded the six-month cap on detentions, and (ii) there is no significant likelihood of his

removal in the reasonably foreseeable future.  Further, the Petitioner maintains that continued

indefinite detention pending his removal denies him substantive due process under the Fifth

Amendment.  Last, despite the annual parole review process provided the Petitioner under 8

C.F.R. § 212.12, he argues that his detention denies him procedural due process under the Fifth

Amendment.[1]

For the reasons set forth below, Betancourt's claims fail and this Court should dismiss his Petition. As an initial matter, Petitioner's reliance on <u>Zadvydas</u> is misplaced. As discussed fully below, the United States Supreme Court explicitly limited its holding in <u>Zadvydas</u> to aliens whom INS previously granted lawful permanent resident status, and nearly every circuit court has refused to extend <u>Zadvydas</u> to include "excludable" aliens. Petitioner, who concedes that he is an "excluded" alien (<u>see</u> Report and Recommendation, *Lovegreen, J.*), erroneously argues for constitutional rights that are afforded only to "resident" aliens. It is well established that "excludable" aliens, like the Petitioner, do not possess due process rights, and enjoy only those procedures authorized by Congress. Here, Congress has established procedures concerning the detention and parole for Mariel Cuban under 8 C.F.R. § 212.12. These regulations are well within the sovereign's power to set immigration policy and do not violate the Fifth Amendment.

## STATEMENT OF FACTS[2]

Petitioner is one of several thousand Cuban nationals, many of whom, like Petitioner, were convicted of crimes in Cuba, who attempted to enter the United States illegally during the 1980 Mariel boatlift.[3] <u>See</u> Petition, ¶¶ 10, 11. In May 1980, Petitioner arrived near Key West,

---

[1]     The United States Supreme Court will soon decide the very issues presented by the instant Petition. In October 2004, the Court will hear arguments on whether the continued detention of a Mariel Cuban, who, like the Petitioner in the instant matter, was apprehended at the border of the United States, was denied admission, and was subsequently ordered removed from the United States based on his criminal activities, is lawful, when effectuation of the removal order is not immediately foreseeable. <u>See</u> <u>Benitez v. Wallis</u>, 337 F.3d 1289 (11th Cir. 2003), <u>cert. granted</u>, __ U.S. __, 124 S. Ct. 1143 (2004).

[2]     The facts contained herein are drawn from the instant Petition, the Petitioner's Affidavit, and Judge Lovegreen's December 18, 2003 Report and Recommendation, all contained in the civil docket for this action.

[3]     For nearly fifteen years, Fidel Castro unloaded massive waves of refugees in the United States, many of whom were dissidents, criminals, or mental patients. As part of this scheme, in the 1980's, Castro allowed nearly 175,000 refugees to make their way to the United States. <u>See</u> <u>Benitez</u>, 337 F.3d at 1290 n.1. INS stopped the Mariel Boatlift Cubans, including the Petitioner, at the border, refused them entrance into the United States, and held

Florida, and was prevented from entering the United States. <u>See</u> Affidavit of Petitioner Manuel

Vera Betancourt ("Betancourt Aff.") p. 1. Later, the INS granted Petitioner temporary

immigration parole pursuant to 8 U.S.C. 1182(d)(5)(A).[4]

Petitioner was convicted of numerous crimes while he was on parole. <u>See</u> Report and

Recommendation, p. 2; Betancourt Aff. p. 2. In 1983, Petitioner was convicted in New York of

criminal sale of a controlled substance (cocaine) in the fifth degree. He was sentenced to five

years probation. Also in 1983, he was convicted in New York of criminal possession of stolen

property in the third degree. In 1986, Petitioner was convicted in New York of attempted

criminal possession of a weapon (gun) in the third degree and was sentenced to one and one-half

to three years in prison. In 1988, the State of New York convicted Petitioner of assault with a

knife in the third degree and sentenced him to one year in prison. In 2000, Petitioner was

convicted for a second time of criminal possession of a controlled substance.

In January 2003, the INS revoked Petitioner's immigration parole and commenced

removal proceedings against him based on his criminal convictions and his lack of valid

---

them in custody.

As a humanitarian gesture, rather than leaving them to die in the open seas, the Attorney General, through the INS, soon paroled a majority of those Cubans into the United States pursuant to his discretionary authority under 8 U.S.C. 1182(d)(5) (1976 & Supp. IV 1980). Thus, Mariel Boatlift Cubans never "entered" the United States and, therefore, have no constitutional right or statutory entitlement to be admitted or released into the United States. <u>See</u> <u>generally</u> <u>Zadvydas</u>, 533 U.S. at 693-694; <u>Shaughnessy v. United States ex rel. Mezei</u>, 345 U.S. 206, 212 (1953).

Federal law, however, permitted Cubans who were paroled into the United States to adjust their "excluded" status to "permanent resident" after one year. <u>See</u> Cuban Refugee Adjustment Act, 8 U.S.C. § 1255. Cuban aliens who engaged in serious criminal activity were not eligible for adjustment of status. <u>Id.</u>

[4]     8 U.S.C. § 1182(d)(5)(A) then authorized, and as amended still authorizes, the Attorney General (now, the Secretary of Homeland Security) to parole aliens applying for admission to the United States into the country "temporarily under such conditions as he may prescribe" and only for "urgent humanitarian reasons or significant public benefit," <u>however</u>, "such parole of such alien shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A).

documents for entering the United States.  <u>See</u> Report and Recommendation, p. 2.  On April 8,

2003, an immigration judge determined the Petitioner is removable and ordered him removed to

Cuba, pursuant to the Immigration Nationalization Act, 8 U.S.C. § 1182, <u>et seq</u>.  <u>See</u> Report and

Recommendation, p. 2.  Petitioner currently awaits deportation to Cuba.[5]  <u>See</u> Petition, ¶ 12.

Petitioner did not appeal this order and, in his own words, cooperated with INS in the process for

his removal to Cuba.  <u>See</u> <u>Id</u>., ¶¶ 6, 10, 13.  As required by the parole regulations applicable to

Mariel Cubans, <u>see</u> 8 C.F.R. 212.12(g), the INS interviewed the Petitioner and reviewed his

detention.  In February 2004, the INS determined that Petitioner was ineligible for re-parole, as a

potentially violent person and a threat to the community if released.[6]  Petitioner's next scheduled

annual review is early next year.

---

[5]        In 1984, the United States and Cuba reached an agreement concerning immigration and repatriation that, *inter alia,* called for the return to Cuba of specified individuals with serious criminal backgrounds or mental infirmities.  Approximately 1672 Mariel Cubans have been repatriated under that agreement, with the most recent repatriations occurring in April 2004.  To date, discussions between the United States and Cuban are on-going with respect to the repatriation of Cuban nationals.

[6]        It is the Cuban Review Panel that makes the determination whether it is in the public interest to release a detainee from INS custody.  Before the Panel makes a recommendation that a detainee be granted parole, a majority of the Panel must conclude that "(i) The detainee is presently a nonviolent person; (ii) The detainee is likely to remain nonviolent; (iii) The detainee is not likely to pose a threat to the community following his release; and (iv) The detainee is not likely to violate the conditions of his parole."  8 C.F.R. § 212.12(d)(2).

The panel must also consider the following factors when determining whether to recommend further detention or release on parole of a detainee: "(i) The nature and number of disciplinary infractions or incident reports received while in custody; (ii) The detainee's past history of criminal behavior; (iii) Any psychiatric and psychological reports pertaining to the detainee's mental health; (iv) Institutional progress relating to participation in work, educational and vocational programs; (v) His ties to the United States, such as the number of close relatives residing lawfully here; (vi) The likelihood that he may abscond, such as from any sponsorship program; and (vii) Any other information which is probative of whether the detainee is likely to adjust to life in a community, is likely to engage in future acts of violence, is likely to engage in future criminal activity, or is likely to violate the conditions of his parole."  8 C.F.R. § 212.12(d)(3).

**ARGUMENT**

I.    **PETITION FAILS TO STATE A CLAIM AS A MATTER OF LAW**

A review of the long-standing legal precedent concerning the issues raised in the Petition warrants its dismissal. Petitioner's detention is lawful because he formally has never been admitted into the United States. The Petition challenges the constitutionality of the procedures provided by Congress and the Attorney General to excludable aliens, like the Petitioner,[7] under 8 C.F.R. 212.12, et seq. Petitioner argues that the procedural safeguards given to Mariel Cubans under 8 C.F.R. § 212.12 violate the Fifth Amendment and that his detention is in violation of the six-month rule established in Zadvydas. Essentially, Petitioner insists that he has a right to be released or paroled, despite the fact that he has never gained entry into this country and notwithstanding the government's express determination in February 2004 that he poses a risk to the public.

A.    **Jurisdiction and Scope of Review**

This Court has jurisdiction to address challenges to the lawfulness of an alien's detention under the federal habeas corpus statute. See Zadvydas, 533 U.S. at 687-688. However, judicial review of immigration matters is extremely limited. See INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999) ("We have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'"); Hampton v. Mow Sun Wong, 426 U.S. 88, 102 n.21(1976) ("the power over aliens is of a political character, and therefore subject only

---

[7]    Petitioner does not challenge the Attorney General's determination that he is an inadmissible or excludable alien who is lawfully excluded from the United States and should be repatriated to Cuba. See Report and Recommendation, p. 3.

to narrow judicial review.")

The genesis of the Court's limited power of review emanates from the deeply rooted principle that Congress has plenary power to decide under what conditions aliens will come into the United States.  Kleindienst v. Mandel,  408 U.S. 753, 766 (1972).  Indeed, the Supreme Court has underscored  "the limited scope of inquiry into immigration litigation," and "has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens."  Fiallo v. Bell, 430 U.S. 787, 792 (1977) *(quoting* Oceanic Navigation Company v. Stranahan, 214 U.S. 320, 339 (1909)).

Accordingly, the circuit courts have accorded much deference to both the Attorney General's understanding of his authority to detain excludable aliens and to the decisions of those delegates granting or denying immigration parole under 8 U.S.C. § 1182 (d)(5).   See Barrera-Echavarria v. Rison, 44 F. 3d 1441 (9th Cir.), cert. denied, 516 U.S. 976 (1995) (declining to disturb the statutory interpretation to which Congress has acquiesced for at least four decades, particularly when Congress has been aware of litigation brought by Mariel Cubans who face long-term detention in federal prisons pending attempts to exclude them to Cuba, and has amended related statutes without changing the agency's interpretation) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984)).

**B.    The Petitioner, an Inadmissible (or Excluded) Alien, Has Not Been Improperly Denied Any Rights Under Federal Law**

    1.    <u>The Power To Exclude Aliens Is An Essential Attribute Of The United States' Sovereignty, To Be Exercised Exclusively By The Executive Branch and Congress.</u>

The power to control the admission of foreigners and aliens is an inherent attribute of national sovereignty and is "essential to self-preservation." <u>Ekiu v. United States</u>, 142 U.S. 651, 659 (1892); <u>see also</u> <u>Fong Yue Ting</u>, 149 U.S. 698, 707-711(1893). The sovereign's power to differentiate between aliens who have "entered" this country and those who have not harkens back several decades. <u>See</u> <u>Shaughnessy v United States ex rel. Mezei</u>, 345 U.S. 206, 212 (1953)[8]; <u>Guzman v. Tippy</u>, 130 F. 3d 64, 65 (2nd Cir. 1997) ("A sovereign state has a right to exclude aliens. Congress maintains the power to enforce this right, having virtually absolute authority over the admission of aliens."). Thus, the political branches of our government have complete authority to establish and implement substantive and procedural rules governing the admission and deportation of aliens. <u>See</u> <u>Mezei</u>, 345 U.S. at 210 ("[c]ourts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."); <u>United States ex rel. Knauff v. Shaughnessy</u>, 338 U.S. 537, 542 (1950) (the power to exclude is a legislative and an "inherent executive" power); <u>Jean v. Nelson</u>, 727 F.2d 957, 964 (11th Cir. 1984).

"Entry" into the United States remains the yardstick for measuring what rights are

---

[8]    The Supreme Court decision in <u>Zadvydas</u>, 533 U.S. 678 (2000) reaffirmed its decision in <u>Mezei</u>, <u>supra</u>, in which the Court recognized the legal distinction between aliens that have effected entry into the United States (i.e., "resident" or "deportable" aliens) and those who have never entered (i.e. "excludable" or "inadmissable" aliens) holding that the Fifth Amendment does not afford an inadmissible or excludable alien any right against continued immigration custody, even if such detention is indefinite or prolonged because no country has agreed to take the alien.

bestowed upon an alien.  See Landon v. Plasencia , 459 U.S. 21, 26 (1982); Zadvydas, 533 U.S. at 693 ("The distinction between an alien who has affected an entry into the United States and one who has never entered runs throughout immigration law.").  In this regard, the law recognizes that even if an alien is geographically within U.S. borders, he can be deemed excluded and not have accomplished a cognizable entry in this country.  See, e.g., Gisbert v. Attorney General, 988 F. 2d 1437, 1440 (5th Cir. 1993).  Indeed, aliens who have reached our border, but have not been admitted formally for entry into the United States are deemed "excludable" or "unadmitted" aliens and are considered as if they were stopped at the border or stand at the threshold of entry. Mezei, 345 U.S. at 216; Gisbert, 988 F. 2d at 1440; Borrero v. Aljets, 325 F.3d 1003, 1007 (8th Cir. 2003); Jean, 727 F. 2d at 961 n.1 (aliens who have reached our border but have not been admitted formally to the United States are described as "excludable" or "unadmitted" aliens.  On the other hand, aliens who have succeeded in effectuating an "entry in contemplation of the law" are described as "resident" or "deportable" aliens). In these circumstances, an excludable alien's physical presence is treated as a grant of parole by the United States government, subject to its administration by the INS; however, parole in this context does not constitute an entry.  Borrero, 325 F.3d at 1008.

> 2.    Petitioner Is An Inadmissible (Or Excludable) Alien, That Is, He Never Legally Entered Into The United States.

There is no doubt that the Mariel Cubans who arrived in 1980, including Petitioner, were detained at the border and later determined as "excluded" from the United States.  Gisbert, 988 F. 2d at 1439; Garcia-Mir v. Smith, 766 F.2d, 1478, 1480 (11th Cir. 1985) (Mariel Boatlift Cubans were properly characterized as excludable aliens with no right of entry when they arrived on our shore, although they were paroled eventually into this country.  However, virtually all of

them were issued exclusion orders by immigration authorities, mostly as a result of criminal conduct), <u>cert. denied</u>, 475 U.S. 1022 (1986).

In fact, Betancourt does not contest his status as an "excludable" alien.  <u>See</u> Report and Recommendation.  Instead, Petitioner asserts that even though he is an excludable alien, his continued detention violates 8 U.S.C. § 1231(a)(6) as interpreted by <u>Zadvydas</u>, <u>supra</u>.  As discussed <u>infra</u>, however, because Petitioner is an "excluded" alien, he does not enjoy the same constitutional protections afforded to those aliens who have been deemed admitted.  <u>Mezei</u>, 345 U.S. at 216; <u>Gisbert</u>, 988 F.2d at 1440; <u>Borrero</u>, 325 F.3d at 1007; <u>but</u> <u>see</u> <u>Rosales-Garcia v. Holland</u>, 322 F.3d 386 (6th Cir. 2003) (en banc) (in a divided panel opinion, circuit court held that excludable aliens stopped at border benefit from *some* limits on detention as admitted aliens), <u>cert. denied</u>, 539 U.S. 941 (2003); <u>Xi v. INS</u>, 298 F.3d 832 (9th Cir. 2002) (holding that <u>Zadvydas</u>' reasoning and statutory interpretation applies to inadmissible aliens) <u>cited</u> <u>with approval</u> <u>in</u> <u>Martinez-Vazquez v. INS</u>, 346 F.3d 903, 905 (9th Cir. 2003).

       3.    <u>Petitioner's Due Process Guarantees Do Not Stem From The United States Constitution But Rather From The Procedures Established By Congress.</u>

The United States Supreme Court has rejected claims that the parole or detention of an <u>unadmitted</u> alien has any effect on the alien's status under the law.  <u>See</u> <u>Leng May Ma v. Barber</u>, 357 U.S. 185, 188 (1958); <u>Benitez</u>, 337 F.3d 1296 (there is a "fundamental difference in the legal status of (1) unadmitted aliens and (2) resident aliens who have effected 'entry' into the United States, whether illegally or legally.").  It is understood, therefore, that when an alien stands on the threshold of initial entry, like excludable aliens, he stands on a different footing than other admitted aliens, enjoying only those procedures authorized by Congress. <u>Mezei</u>, 345 U.S. at 212; <u>Knauff</u>, 338 U.S. at 544 ("Whatever the procedure authorized by Congress is, it is due process as

9

far as an alien denied entry is concerned.").  Stated differently, as an excluded alien, due process guarantees do not stem from the Fifth Amendment, but rather are determined by the procedures established by Congress.  See Kwong Hai Chew v. Colding, 344 U.S. 590, 600 (1953) ("'excludable' aliens ... are not within the protection of the Fifth Amendment"); see also Zadvydas, 533 U.S. at 693; Gisbert, 988 F. 2d at 1443; Guzman, 130 F. 3d at 66;  Hoyte-Mesa v. Ashcroft, 272 F. 3d 989, 991 (7th Cir. 2001) (affirming the lower court's decision dismissing petition of Mariel Cuban challenging indefinite detention, the Seventh Circuit relied on the basic premise that excludable aliens do not possess the same constitutional protections as resident aliens), cert. denied, 537 U.S. 846 (2002).

Here, detention review procedures have been established by Congress for Mariel Cubans under 8 C.F.R. § 212.12.  In his Petition, Betancourt acknowledges that he possesses procedural rights under this statutory framework.  See Petition, ¶ 25.  Nevertheless, Petitioner is dissatisfied with the protections afforded him by the Attorney General through the annual review process under 8 C.F.R. § 212.12 et seq, because it is his unfounded belief that the designated panel reviewers harbor bias toward continued detention.[9]  See Petition, ¶ 25.  Needless to say, these bald contentions that the Cuban Panel review process violates the Fifth Amendment had been rejected summarily and must fail.  See Borrero, 325 F.3d at 1008 ("We hold, however, that the regulations governing parole of Mariel Cubans, 8 C.F.R. § 212.12, are well within the sovereign prerogative of the executive branch to set immigration policy and do not violate the Fifth

_____

[9]     In support of this claim, Petitioner misplaces his reliance on case law questioning whether *District Directors* are biased in their review of an alien's detention pursuant to 8 C.F.R. § 241.4.  See, e.g., Phan v. Reno, 56 F. Supp. 2d 1149 (W.D. Wash. 1999); St. John v. McElroy, 917 F. Supp. 243, 251 (S.D.N.Y. 1996).  These decisions do not call into question the objectivity of the *Cuban Parole Review Panel's* review of an alien's detention under 8 C.F.R. § 212.12.

Amendment's Due Process Clause.").

Under the Cuban Parole Review Plan, a panel reviews an excluded Mariel Cuban's detention annually to determine if he meets established criteria for grant of discretionary parole under 8 C.F.R. § 212.12(g)(2). See Barrera-Echavarria, 44 F. 3d at 1450; Sierra, 258 F. 3d at 1216. If denied, a detained Mariel Cuban has, and will continue to have on an annual basis, the opportunity to plead his case to the Cuban Parole Review Panel. See Guzman, 130 F. 3d at 66. Here, as stated above, based on its interview of Betancourt and review of his detention, the Cuban Parole Review Panel, pursuant to 8 C.F.R. § 212.12, found the Petitioner ineligible for re-parole, as a potentially violent person and a threat to the community if released. Petitioner is scheduled to have another substantive review of his detention under 8 C.F.R. § 212.12 in early 2005.

4.    Petitioner Has No Statutory Right Of Entry Or Parole Under 8 U.S.C. § 1231(a)(6).

Bentancourt insists Zadvydas' narrow holding applies to "excludable" aliens like himself.[10]  See Petition, ¶19. Stated another way, he asserts that § 1231 (a)(6) creates a right to parole into the United States after six months for *inadmissible* aliens who have *never* gained entry into this country. Nonetheless, the Supreme Court in Zadvydas held otherwise. Briefly, in

---

[10]    In addition to Xi, supra, Bentancourt cites to the decision of Borrero v. Aljets, 178 F. Supp. 2d 1034 (D. Minn. 2001) for the proposition that the Zadvydas holding applies to excluded aliens. However, that lower court decision was overturned by the Eighth Circuit in Borrero v. Aljets, 325 F. 3d 1003, 1007 (8th Cir. 2003) wherein the Court specifically concluded that Zadvydas' six-month presumption of reasonableness was inapplicable to excluded aliens. In fact, excluding the Sixth and Ninth Circuits, every circuit to address the issue has followed Borrero, holding that Zadvydas does not extend to excluded aliens. See Sierra v. Romaine, 347 F.3d 559, 576 (3rd Cir. 2003); Benitez v. Wallis, 337 F.3d 1289, 1298-99 (11th Cir 2003) ( per curium followed Mezei); Rios v. INS, 324 F.3d 296, 297 (5th Cir. 2003); Hoyte-Mesa v. Ashcroft, 272 F.3d 898, 991 (7th Cir. 2001), cert. denied, 537 U.S. 846 (2002); Sierra v. INS, 258 F.3d 1213, 1218 (10th Cir.), cert. denied, 534 U.S. 1071 (2001); see also Napoles v. INS, 278 F. Supp. 2d 272, 277 (D. Conn. 2003); Morales v. Conley, 224 F. Supp. 2d 1070, 1076-1077 (D. W. Va. 2002).

Zadvydas, the Supreme Court addressed the legality of post-order detention under section
241(a)(6) of the INA, 8 U.S.C. § 1231(a)(6), in the cases of two aliens previously admitted to
lawful permanent resident status, but subsequently ordered deported.  To avoid what it termed a
serious constitutional question with respect to that specific class of aliens, the Court construed
the statute as authorizing detention for a period reasonably necessary to remove such an alien,
presumptively six months absent evidence to show that deportation is likely to occur in the
reasonably foreseeable future beyond that time.  Zadvydas, 533 U.S. at 701.  The Supreme Court
specifically went on to say that *"aliens who have not yet gained initial admission to this country*
*would present a very different question."*  Id. at 682 (emphasis added).  See generally Borrero,
325 F.3d at 1005 ("Because the detention of inadmissible aliens does not raise the same
constitutional concerns as does the detention of admitted aliens, we conclude that Zadvydas's
narrowing construction of [8 U.S.C.] § 1231(a)(6) does not limit the government's statutory
authority to detain inadmissible aliens.").

        Indeed, the Supreme Court stated that its holding in Zadvydas did not disturb its earlier
decision in Mezei, 345 U.S. 206, in which it held that detention of a non-admitted, "excludable"
alien did not implicate any statutory or constitutional right, even if that detention was prolonged
because no country would accept the alien.  Mezei, 345 U.S. at 215-16.[11]  As one Judge in the
District of Massachusetts recently held in a nearly identical case, "the Zadvydas rule applies to
admitted aliens, not those who were paroled (i.e., excluded) like the Petitioner [a Mariel

---

        [11]        In explaining its decision in Zadvydas, the Supreme Court carefully distinguished between aliens
who had "entered" or been admitted to the United States, but were subsequently ordered removed (i.e., deportable
aliens), and aliens, like Petitioner, who have never gained initial admission to this country (i.e., non-admitted,
excludable aliens "who are 'treated,' for constitutional purposes, 'as if stopped at the border'").  Zadvydas, 533 U.S.
at 682, 693 (quoting Mezei, 345 U.S. at 213, 215).

Cuban]." See Concepcion-Perez v. Perroncello, 2003 WL 21731302 (D. Mass. 2003), a copy of which is attached hereto as Exhibit A. As noted by the Court (per Zobel, J.), "whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Id., citing Knauff, 388 U.S. at 544.

Petitioner, essentially, is asking this Court to "bestow on [him] the very rights that were denied [him] when [his] immigration parole was revoked on the basis of [his] criminal activity in the United States." Gisbert, 988 F.2d at 1447. Such a result cannot be allowed. "To pervert this gift [of parole while their immigration applications and status are finalized] from Congress into a right after six months not only would distort Congress's intent and potentially create grave security concerns for the people of the United States, but also would create needless difficulties in how the INS processes aliens."

## CONCLUSION

Accordingly, for the reasons articulated above, the Petition should be dismissed.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:     /s/ Damian W. Wilmot
DAMIAN W. WILMOT
Assistant U.S. Attorney
John Joseph Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated:        September 20, 2004

## CERTIFICATION UNDER L.R. 7.1

Because Petitioner is a prisoner currently incarcerated in a federal correctional facility, counsel for the United States respectfully requests leave to file this Memorandum in Support of Respondents' Motion without a 7.1 conference.

   /s/ Damian W. Wilmot
DAMIAN W.  WILMOT
Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I certify that on September 20, 2004, I caused a copy of the foregoing Memorandum in Support of Respondents' Motion to be served on Petitioner by first class mail, postage pre-paid to Manuel Vera Betancourt, #22-790-964, at Plymouth County Correctional Facility, ID No. 36779, Unit E3, Room 323, 26 Long Pond Road, Plymouth, MA 02360.

   /s/ Damian W. Wilmot
DAMIAN W.  WILMOT
Assistant U.S. Attorney